**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ANDREW KING,

        Petitioner,

v.                                                            Case No. 3:22-cv-1148-TJC-MCR

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS
and THE FLORIDA ATTORNEY
GENERAL,

        Respondents.

_____

**ORDER**

## I.    Status

Petitioner, an inmate of the Florida penal system, is proceeding pro se on a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Doc. 1) with exhibits (Docs. 1-1 to 1-8). Petitioner challenges a state court (Duval County, Florida) judgment of conviction for first-degree murder and armed burglary. He is serving a life sentence. Doc. 1 at 2. Respondents filed a Response (Doc. 5) with exhibits (Docs. 6, 7, 8).[1] Petitioner filed a Reply (Doc. 9). This case is ripe for

---

[1] The Court will cite exhibits by document and page number as assigned by the Court's electronic case management system.

review.[2]

## II.   Governing Legal Principles

### A. Standard Under § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), abrogation in part on other grounds recognized by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 584 U.S. 122, 125-26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that

3

state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified) (emphasis in original).

**B. Ineffective Assistance of Counsel**

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington,

4

466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-

5

court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105).

## III.   **Factual Background and Procedural History**

This case arises from the murder of Felicia Burney and her full-term, unborn child. In April 2010, Burney moved to Jacksonville to live in a house rented by Danielle Butler, Petitioner's on-again, off-again girlfriend. State v. King, 325 So. 3d 313, 315-16 (Fla. 1st DCA 2021). The house was "about 700 square feet." Id. at 316. Butler "had a full-time day job," was "attending night classes to become a medical assistant," and was the primary caregiver for her two-year-old son.[3] Id. Butler allowed Burney to live in the house rent-free "in exchange for babysitting and housekeeping services during the many hours a day when [Butler] was at work or school." Id.

---

[3] Petitioner is not the biological father of Butler's child. Doc. 6-13 at 18.

6

Soon after Burney began living in the house, Petitioner moved in. Id. Burney and Petitioner had a "contentious relationship." Id. She "did not like [Petitioner], was often rude and malicious toward him, and tried to convince [Butler] to leave him." Id. Petitioner eventually demanded that Butler "choose between him and [Burney]," because "he would not stay while [Burney] was living" in the house. Id. Presented with this "ultimatum," Butler chose Burney. Id. Petitioner left to live with his mother "only five blocks away." Id.

One month before the murder, on May 12, 2010, Petitioner went to Butler's house "armed with a claw hammer and demanded entry." Id. at 317. He was upset because Butler had refused to "return his laptop." Id. at 316. Inside the house were Butler, Butler's son, Burney, and a man Petitioner mistakenly believed was "another of [Butler's] boyfriends." Id. at 317. When entry was refused, Petitioner "flew into a rage, kicked through the wooden panel at the bottom of the front door," and broke "the glass in the front door, sticking his head through the opening." Id. The police were called. Id. Petitioner waited for law enforcement "without fleeing" and "admitted guilt." Id. He was convicted of "criminal mischief" and ordered to "stay away from the residence," but he and Butler soon "resumed their intimate relationship." Id.

On the evening of June 7, 2010, Burney called Butler at school and told her that her son "had received a large number of ant bites and needed to go to the hospital." Id. Butler went home, picked up her son and Burney, and drove

to the emergency room. Id. Burney "insisted on stopping to eat first, which irritated" Butler. Id. After several hours of waiting to be seen at the hospital, Butler's son "seemed better," so the three went home shortly after 11:00 p.m. Id. At 1:05 a.m., Burney called a friend because "she wanted to leave Jacksonville and go back home to Palatka." Id.

Shortly before 1:00 a.m., Petitioner learned that Butler "had sent a topless picture of herself to another previous boyfriend." Id. This led to "an exchange of tense texting and phone calls between" Petitioner and Butler. Id. Petitioner called Butler a "lying b*tch" and said, "The only reason you had me around was to use me to do the things you didn't want to do." Doc. 6-20 at 56. Around 3:26 a.m., Petitioner texted Butler that he would leave his keys to her house at the end of her driveway, "so that I don't get accused of something I didn't do." King, 325 So. 3d at 317. Petitioner also said he was "already walking through the neighborhood." Id. Butler checked the driveway and did not find any keys. Id.

Around 4:00 a.m., Butler went to sleep in her bedroom. Id. at 318. She woke around 10:00 a.m. "even though it was a workday and she had set multiple alarms on her phone to ensure that she got up on time." Id. Butler noticed that "her phone and glasses had been moved and were not within reach where she had put them." Id. She also saw "two pieces of yellow rope on her bedroom floor" and "part of one of her t-shirts on the bed pillow next to hers." Id. Butler found

8

her phone and glasses in the living room, then used the phone to take pictures of the rope and her torn t-shirt. Id.

Butler called out to Burney, who was "sleeping on her left side at her usual place on a love seat in the living room." Id. Burney did not respond, which Butler later said was "normal" for her. Id. Butler then checked on her son; he was still asleep. Id. Apparently unbeknownst to Butler, Burney had been "killed by multiple stab wounds." Id. at 320. The first wound penetrated behind Burney's right ear, "nearly severing [her] spinal column" and "render[ing] her unable to defend herself or to call out, except for perhaps a brief sound or two." Id. Another wound penetrated the back of Burney's right arm and entered her lung, "severing major arteries." Id. The injuries led to the death of Burney's full-term baby girl, who was "perfectly normal and would have lived if her mother had not first died." Id. at 320-31. Butler claimed that she checked on Burney "without realizing that [she] was dead, and without noticing [her] visible injuries and blood." Id. at 318.

At 10:25 a.m., approximately twenty-five minutes after waking up, Butler called her aunt and said that Petitioner "was trying to scare her." Id. At her aunt's suggestion, Butler went outside to check her car. Id. She saw that "the landline phone wire was cut and the cable was unhooked." Id. Petitioner "used to work for a cable company and had installed her cable for her." Id. at 318-19. Butler also discovered that the "outside laundry room door at the back of the

9

house was ajar," that the "door from the laundry room into the kitchen was also open," and that Petitioner's house keys "were on the dryer." Id. at 319.

Butler went back through the kitchen into the living room, where her son was "asking [Burney] to turn on" the television. Id. Butler claimed that she "saw something dark coming from [Burney's] mouth, which she thought was drool or food, because [Burney] often ate pudding or candy before falling asleep." Id. Butler removed the covers from Burney and finally saw that she "appeared to be dead." Id. Butler phoned her aunt, who told her to call 911, which she did at 10:50 a.m. Id.

Law enforcement arrived and searched the house, finding (among other things) yellow rope in the master bedroom and "the sheath of a fish fillet knife on the top bunk in the boy's room next to a sippy cup." Id. According to the medical examiner, Burney's stab wounds came from a "blade consistent with that of a fish fillet knife." Id. at 320. Petitioner's mother later told police that "a fish fillet knife was missing from her house," and she "identified the knife sheath found at the murder scene as the one missing from her house." Id. She also said the rope from the murder scene "looked like one that had been on her front porch just recently but had gone missing." Id. Petitioner "was the major contributor to the DNA on the knife sheath and the rope, while none of [Butler's] DNA could be identified on those items." Id.

Petitioner's mother saw him at her house at 1:00 a.m. on the morning of

10

the murder, but he was gone by 3:30 a.m. "when she got up to make coffee." Id. at 318. When she left the house around 5:00 a.m., Petitioner was asleep on the couch. Id. But when she returned at 8:00 a.m., he was gone again. Id. She called him at 8:19 a.m., and he arrived at the house two or three minutes later. Id. He asked to "use her washing machine to wash some of his clothes—something she testified he had never done before." Id.

A jailhouse informant claimed that Petitioner "confessed in full to him, including details not available to the public." Id. According to the informant, Petitioner said that he entered the house through the back door, stabbed Burney to death in the living room, began making his way to Butler's bedroom, but then "got paranoid and left the house." Doc. 6-15 at 96.

Petitioner was charged with two counts of first-degree murder for killing Burney and her unborn child. Doc. 6-2 at 70. He was also charged with armed burglary. Id. at 70-71. In the first trial, the prosecution sought the death penalty. Doc. 6-1 at 17. The trial ended with a hung jury. King, 325 So. 3d at 315. The prosecution waived the death penalty before the second trial, which also ended with a hung jury. Id.; Doc. 6-1 at 9. The jury in the third trial found Petitioner guilty as charged, and he received three consecutive sentences of life imprisonment. King, 325 So. 3d at 314-15. Petitioner's defense at all three trials was that Butler "committed the murder and staged the scene to frame him." Id. at 315.

11

The First District Court of Appeal (First DCA) affirmed the convictions without a written opinion. King v. State, 156 So. 3d 1080 (Fla. 1st DCA 2015). Petitioner sought postconviction relief under Florida Rule of Criminal Procedure 3.850. Doc. 7-8 at 491. Following an evidentiary hearing, the postconviction court granted relief on one claim: that "trial counsel was ineffective for failing to introduce evidence of a 'temperature discrepancy' between the inside and outside of the house where the murder occurred." King, 325 So. 3d at 315. The First DCA reversed in a lengthy opinion, holding that Petitioner "did not demonstrate either deficient performance or prejudice." Id. This federal habeas petition followed. Doc. 1.

## IV.   Analysis

In his sole ground for federal habeas relief, Petitioner renews his claim that trial counsel should have advanced a "temperature discrepancy" argument. Doc. 1-1 at 5-15. On the morning of the murder, Butler allegedly went to sleep at 4:00 a.m., woke around 10:00 a.m., and called 911 to report Burney's death at 10:50 a.m. Id. at 318-19. When police arrived minutes later, the back door of the house "was open far enough that a person could walk through it." Id. at 321. According to Petitioner, the temperature inside the house was 70 degrees, and the temperature outside was between 75 and 78 degrees. Doc. 7-8 at 518. Moreover, a photograph of a thermostat inside the house "show[ed] a digital

12

display, with the number '79' in large digits filling most of the screen." <u>King</u>, 325 So. 3d at 321.

Petitioner contends that the temperature discrepancy, along with the thermostat picture, supports his defense that Butler staged the scene to "frame" him for Burney's murder. Doc. 9 at 12. The argument runs as follows. If, as Butler alleged, the back door of the house had been open for several hours before she woke at 10:00 a.m., and if the outside temperature was 75 to 78 degrees, then the house should have been warmer than 70 degrees when the police arrived. <u>Id.</u> at 14. According to Petitioner, however, it was only 70 degrees inside the house when law enforcement showed up. <u>Id.</u> Petitioner thus infers that Butler opened the back door shortly before the police arrived and tried to warm the house by setting the thermostat to 79 degrees. <u>Id.</u> This was allegedly done so that the interior temperature would appear consistent with Butler's account. <u>Id.</u> Petitioner argues that counsel should have used the temperature discrepancy to bolster his "primary defense" that Butler framed him for the murder. Doc. 1 at 7.

**A. The First DCA's Decision**

The First DCA rejected Petitioner's ineffective-assistance claim, holding that he failed to "demonstrate either deficient performance or prejudice." <u>King</u>, 325 So. 3d at 315. According to the court, counsel was not deficient because "the thermostat picture and argument about the temperature discrepancy lack[ed]

13

a legally sufficient evidentiary basis." Id. at 325. First, there was insufficient "factual foundation" for Petitioner's assertion that the interior of the house was 70 degrees when the police arrived on the morning of June 8, 2010. Id. at 324. The 70-degree figure came exclusively from the lead detective, who testified that she responded to the scene at 12:22 p.m. on June 8, but "*did not enter the house that day*." Id. at 321 (emphasis in original). To be sure, the detective stated "that her written report (which was not itself entered into evidence) indicated the inside temperature was 70 degrees and the outside temperature was between 75 and 78 degrees." Id. But, as the court noted, the detective did not "explain when the temperature readings were made or by whom, given that she did not enter the house until the following day, June 9," and "there was no evidence about how someone arrived at these temperatures; *i.e.*, whether by subjective estimate or through some objective measurement." Id. Because the detective "was not in the house on the only relevant day, and there was no evidence of where the 70-degree number came from, her testimony was not competent to establish that inside temperature as fact." Id. at 324. Thus, "no factual foundation supported the conclusion that it was 70 degrees inside the house when law enforcement arrived." Id.

Next, the court noted that "the remaining record evidence established only that it was hot inside the house." Id. at 325. Specifically, "[a]nother detective, an evidence technician, testified that it was in the 90s outside and

14

hot inside the house as they were taking photographs and collecting evidence." Id. Moreover, "no evidence or argument addressed other related issues about the weather the night before and the morning of the murder, nor the effect of other potentially relevant factors such as shading and insulation and the open back door." Id. Simply put, defense counsel "did not have sufficient competent, substantial evidence to establish the inside temperature, so there was no foundation for a 'temperature discrepancy' argument." Id.

The court found that the thermostat picture did not "provide the necessary competent, substantial evidence, because it [was] inconclusive." Id. Petitioner "assumed, without supporting evidence, that the thermostat picture meant that the system had been set so that the air conditioning would not come on until the inside temperature reached 79 degrees." Id. at 322. This would be consistent with the theory that Butler tried to warm the house by setting the thermostat to 79 degrees. But another possibility was that "79" indicated "the temperature inside the house." Id. at 325. Indeed, the thermostat picture "show[ed] that the word 'temp' [was] aligned with the '79,' suggesting '79' indicate[d] the temperature in the house." Id. The problem for Petitioner was that "[n]o evidence of any kind, from a fact or expert witness, established how the thermostat worked and what the display indicated." Id. In the court's view, "[t]he lack of definitive evidence establishing the significance of the '79' on the thermostat display, particularly in light of incompetent or inconclusive evidence

15

about inside and outdoor temperatures, reduce[d] the picture of the thermostat to the status of inconclusive at best." Id.

Thus, because the thermostat picture "was inconclusive and other evidence necessary to develop the temperature-discrepancy defense was not competent or was nonexistent, counsel [was] not deficient for failing to argue this theory in opening or closing." Id. at 326.

The court also addressed the prejudice prong. Id. It found no "'reasonable probability' that the result would have been different if defense counsel had been able to, and did, argue the temperature discrepancy at trial." Id. According to the court, "[e]ven without [the] argument about the possible temperature discrepancy," the jury heard "substantial evidence supporting [Petitioner's] defensive theory that [Butler] was the perpetrator." Id. at 327. In particular, Butler "was on scene and alone with [Burney]; she had a very difficult several weeks and days leading up to the day of the murder; she was likely sleep-deprived and exhausted; and she had just been caught two-timing [Petitioner], resulting in a drawn-out confrontation and argument by text and telephone into the early morning hours." Id. at 326. Moreover, Butler "had a history of conflict with [Burney] and knew [Burney] wanted to move back to Palatka, which would leave her without a free caretaker for her young son." Id. Based on this evidence,

16

the jury "readily could have concluded that [Butler] killed [Burney] in a fit of anger and frustration." Id.

In addition, "the defense presented substantial physical evidence casting doubt on [Butler's] innocence." Id. As the court noted, Burney lay dead "with her face and right arm uncovered within only a few feet of [Butler's] bedroom door." Id. Despite being "inches away" from Burney at times, Butler allegedly did not notice that she was dead for "fifty minutes." Id. Moreover, Butler said that she "noticed something dark running out of [Burney's] mouth, which she thought was pudding or candy, but did not mention noticing a gaping and bloody stab wound on [Burney's] upward-facing, and uncovered, right cheek; nor the stab wound on the exposed right arm." Id. When Butler "finally called 911, she described the rope and t-shirt first before disclosing that [Burney] was dead," and "[s]he wasted no time in identifying [Petitioner] as the perpetrator." Id. Butler also "told the 911 operator she found her cell phone in the laundry room, but testified later that she found it on the kitchen table in the dining area." Id. at 326-27.

Likewise, the court found that "[t]he defense ably demonstrated that the physical evidence at the scene appeared to have been staged." Id. at 327. For example, counsel established that Butler's cellphone pictures "did not match evidence technicians' photos of the interior." Id. Additionally, Butler "claimed a sippy cup was on her nightstand when she woke up but had not been there when

17

she went to bed." Id. When the police arrived, however, "a sippy cup was on the top bunk bed in her son's room immediately beside and aligned parallel to the knife sheath, exactly as if someone carrying both items set them there to pick up a child." Id. Thus, given the "substantial evidence supporting [Petitioner's] defensive theory that [Butler] was the perpetrator," the court found no "reasonable probability" that "the result of the trial would have been different if defense counsel had presented argument that there was a temperature discrepancy." Id.

Finally, the court noted that "the State presented substantial evidence of [Petitioner's] guilt." Id. The court pointed to (1) "voluminous witness testimony and records of text messages and phone calls demonstrating both [Petitioner's] fixation on [Butler] and very strong dislike and resentment of [Burney]"; (2) Petitioner's "recent rage-fueled criminal-mischief break-in"; (3) the "communications on the night of the murder," which "showed that [Petitioner] was again hurt and angry"; (4) the existence of "two gaps of time during which [Petitioner] could have walked the short distance to [Butler's] house and committed the murder"; (5) the admission by Petitioner's mother that the knife sheath and the yellow rope "came from her house," where Petitioner lived; (6) the match between Petitioner's DNA and the DNA found on the sheath and the rope; and (7) the testimony of the jailhouse informant, who "provided very

18

detailed information corroborating several facts of the murder that would not have been available to the public." Id.

### B. Federal Habeas Review of the First DCA's Decision

To obtain federal habeas relief, Petitioner must establish that the First DCA's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. This requires showing "far more than that the state court's decision was merely wrong or even clear error." Shinn v. Kayer, 592 U.S. 111, 118 (2020). Instead, Petitioner must demonstrate that the state court "blunder[ed] so badly that every fairminded jurist would disagree" with the decision. Mays v. Hines, 592 U.S. 385, 392 (2021). Put differently, "if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Hill v. Humphrey, 662 F.3d 1335, 1346 (11th Cir. 2011). "If this standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

Petitioner is not entitled to relief. A fairminded jurist could agree with the First DCA's rejection of his ineffective-assistance claim. Start with the finding that counsel performed adequately. "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000)

19

(quoting Strickland, 466 U.S. at 689-90). "The pivotal question is whether the state court's application of the Strickland standard was unreasonable," which is "different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Thus, to prevail on his ineffective-assistance claim, Petitioner "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020).

Petitioner cannot satisfy this demanding standard. The First DCA held that counsel was not deficient for failing to advance the temperature-discrepancy theory because "[t]he available evidence about the thermostat and the inside and outside temperatures was inconclusive at best." King, 325 So. 3d at 326. A fairminded jurist could agree with that conclusion. The temperature-discrepancy argument rests on the premise that the interior of the house was 70 degrees when the police arrived. But that premise lacks a "factual foundation," as the First DCA explained. Id. at 324. The 70-degree figure "came exclusively from the lead detective's report, but she testified that she did not enter the house until the next day." Id. Moreover, "there was no evidence of where the 70-degree number came from," and "no other evidence established the inside temperature that day." Id. Likewise, the thermostat picture was

20

"inconclusive" because it was unclear whether the thermostat was "set to" 79 degrees or the temperature inside the house was 79 degrees. Id. at 325.

On this record, a fairminded jurist could agree that, because the "evidence necessary to develop the temperature-discrepancy defense was not competent or was nonexistent, counsel [was] not deficient for failing to argue this theory in opening or closing." Id. at 326. Indeed, the Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles, 556 U.S. at 123. In sum, Petitioner cannot show that the First DCA's ruling on the performance prong "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Nor did the First DCA act unreasonably in finding no prejudice. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. "Applying AEDPA to Strickland's prejudice standard, [this Court] must decide whether the state court's

21

conclusion that [counsel's] performance . . . didn't prejudice [Petitioner]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Mungin v. Sec'y, Fla. Dep't of Corr., 89 F.4th 1308, 1317 (11th Cir. 2024).

Once again, Petitioner cannot meet his burden. A fairminded jurist could agree with the First DCA that there is no "reasonably probability" the result would have been different "if defense counsel had been able to, and did, argue the temperature discrepancy at trial." King, 325 So. 3d at 326. Petitioner asserts that the temperature discrepancy, along with the thermostat picture, supports his defense that Butler staged the scene to "frame" him for Burney's murder. Doc. 9 at 12. But even without the temperature-discrepancy argument, counsel "presented substantial physical evidence casting doubt on [Burney's] innocence" and "ably demonstrated" that the murder scene "appeared to have been staged." King, 325 So. 3d at 326-27. Butler "had a history of conflict with [Burney] and knew [Burney] wanted to move back to Palatka, which would leave her without a free caretaker for her young son." Id. at 326. Butler "was on scene and alone with" Burney on the morning of the murder. Id. And despite being "inches away" from Burney at times, Butler allegedly did not notice that she was dead for "fifty minutes" after waking up. Id. Moreover, Butler's cellphone pictures "did not match evidence technicians' photos of the interior," and law enforcement found "a sippy cup . . . on the top bunk bed in her son's

room immediately beside and aligned parallel to the knife sheath, exactly as if someone carrying both items set them there to pick up a child." Id.

As the First DCA explained, "[e]ven without defense counsel's argument about the possible temperature discrepancy, all of this [was] substantial evidence supporting [Petitioner's] defensive theory that [Butler] was the perpetrator." Id. Additionally, the temperature-discrepancy theory was "not supported by competent evidence," so a fairminded jurist could conclude that it would not have aided Petitioner's defense. Id. at 326. On this record, the Court cannot say that the First DCA's finding of no prejudice "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103; see also Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative.").

### C. Petitioner's Arguments Against AEDPA Deference

Petitioner argues that the First DCA's decision is not entitled to AEDPA deference because it is "mired by unreasonable factual determinations." Doc. 1-1 at 4. To show that a state court's adjudication of a claim was based on an unreasonable determination of the facts, a petitioner must demonstrate (1) that particular factual determinations were wrong, by clear and convincing

23

evidence; and (2) that the state court's decision "taken as a whole" constitutes an "unreasonable determination of the facts" and is "based on" that determination. Pye v. Warden, Ga. Diagnostic Prison, 50 F.4th 1025, 1035 (11th Cir. 2022). Thus, a federal court cannot grant relief "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." Id.

Petitioner fails to show that the First DCA's decision was "based on" an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). First, Petitioner contends that the court erroneously found an insufficient "factual foundation" for the 70-degree inside temperature. Doc. 1-1 at 5. As noted above, that figure "came exclusively from the lead detective's report, but she testified that she did not enter the house until the next day." King, 325 So. 3d at 324. According to Petitioner, the Jacksonville Sheriff's Office required the detective to "swear[] to personal knowledge" of the facts in her report. Doc. 1-1 at 6. Thus, Petitioner argues, the detective necessarily had "personal knowledge" of the temperature inside the house when law enforcement arrived. Id. But Petitioner himself concedes that the "record does not make clear how the temperature was recorded." Id. And, as the court pointed out, "there was no evidence of where the 70-degree number came from," and "no other evidence established the inside temperature that day." King, 325 So. 3d at 324. Therefore, Petitioner has not

24

rebutted by clear and convincing evidence the court's finding that "no factual foundation supported the conclusion that it was 70 degrees inside the house when law enforcement arrived." Id.

Second, Petitioner contends that the First DCA erred in relying on "evidence previously deemed inadmissible." Doc. 1-1 at 9. The court noted that, one month before the murder, Petitioner went to Butler's house "armed with a claw hammer and demanded entry." King, 325 So. 3d at 317. Petitioner claims that during a pretrial hearing, any "evidence of a hammer [was] precluded from mention at trial." Doc. 1-1 at 8. That is incorrect. In fact, the trial court prohibited the prosecution from "introducing any evidence that [Petitioner] threw a hammer at Felicia Burney." Doc. 6-5 at 127-28. The court expressly allowed the prosecution to present "evidence relating to all other circumstances relating to the [criminal-mischief] incident . . . , *including the fact that [Petitioner] possessed a hammer*." Id. at 128 (emphasis added). The First DCA never mentioned the allegation that Petitioner threw a hammer at Burney. Thus, it did not rely on "evidence previously deemed inadmissible."[4] Doc. 1-1 at 9.

Third, Petitioner argues that the phrase "at the relevant time" is ambiguous in the following passage from the First DCA's opinion: "[I]n light of

---

[4] The First DCA stated that Petitioner "used the hammer to break the glass in the front door." King, 325 So. 3d at 317. None of the witnesses to the incident testified that

the evidence of [Petitioner's] guilt and the competent testimony that it was hot inside the house at the relevant time, we cannot conclude that there is a reasonable probability that arguing a temperature discrepancy to the jury would have produced an acquittal." King, 325 So. 3d at 327. This sentence is not ambiguous. The court was referring to the testimony of Karen Smith, an evidence technician who helped process the scene. Smith testified that on the morning of June 8, 2010, she arrived at Butler's house. Doc. 6-14 at 82-83. According to Smith, "[it] was hot, we were sweating, [and] so we were probably changing [gloves] a lot more often than we normally would." Id. at 119. Thus, context makes clear that the "relevant time" was the morning of June 8, 2010— that is, the morning Burney's body was discovered.

Fourth, Petitioner challenges the First DCA's assertion that "[t]he timelines established two gaps of time during which [he] could have walked the short distance to [Butler's] house and committed the murder." King, 325 So. 3d at 327. This statement is not clearly erroneous. The murder likely occurred between 4:00 a.m. and 8:00 a.m. on June 8, 2010. Id. at 316. Petitioner's mother saw him at her house at 1:00 a.m., but he was gone by 3:30 a.m. "when she got up to make coffee." Id. at 318. When she left the house around 5:00 a.m.,

---

Petitioner used the hammer to break the glass. Petitioner himself told the police that he broke the glass with a "stick." Doc. 6-15 at 10. Regardless, there is no basis to conclude that the First DCA's ultimate decision hinged on whether Petitioner used a stick or a hammer to break the glass. Pye, 50 F.4th at 1035.

26

Petitioner was asleep on the couch. Id. She returned at 8:00 a.m. to find him gone again. Id. She called him at 8:19 a.m., and he arrived at the house two or three minutes later. Id. Thus, as the court pointed out, two gaps of time existed during which Petitioner could have killed Burney: one between 3:30 a.m. and 5:00 a.m., and the other between 5:00 a.m. and 8:00 a.m.

Fifth, Petitioner argues that the First DCA misstated the record when it noted his "desire to wash laundry" on the morning of the murder. Doc. 1-1 at 10-11. As explained above, Petitioner arrived at his mother's house around 8:20 a.m. The court stated that when he entered the house, Petitioner "asked to use [his mother's] washing machine to wash some of his clothes—something she testified he had never done before." King, 325 So. 3d at 318. This statement is accurate. Petitioner's mother testified that he "asked [her] to start [the washing machine] up for him," and that he had never washed clothes in "that particular washing machine" before. Doc. 6-16 at 130. Petitioner separately contends that his desire to do laundry "is not indicative of wrongdoing." Doc. 1-1 at 11. But a fairminded jurist could find it inculpatory. And "[i]f reasonable minds reviewing the record might disagree about the finding in question, [a federal habeas court] must yield to the state court's factual determination." Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1289 (11th Cir. 2016).

Sixth, Petitioner contends that the First DCA erroneously stated that his "first two trials were death penalty trials that resulted in hung juries." Doc. 1-

27

1 at 6. Specifically, the court wrote that "[i]n the first two trials, the State sought the death penalty, and the trials ended with hung juries. To avoid a twelve-person capital jury in the third trial, [Petitioner] asked the State to drop the death penalty claim, and the State did." King, 325 So. 3d at 315. As Petitioner points out, the prosecution waived the death penalty before the *second* trial, not the third. Doc. 6-1 at 9. Thus, contrary to the First DCA's statement, both the second and third trials were non-capital.

Petitioner has identified a factual error in the First DCA's opinion, but that does not necessarily strip it of AEDPA deference. As noted above, AEDPA deference applies "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." Pye, 50 F.4th at 1035. That is the case here. The First DCA's ultimate decision—that Petitioner failed to establish deficient performance or prejudice under Strickland—did not turn on whether Petitioner's first two trials were capital or non-capital. Indeed, it did not even mention the first two trials in its discussion of the performance and prejudice prongs. King, 325 So. 3d at 325-28. Thus, there is no basis to conclude that the First DCA's "factual mistake had any meaningful effect on [its] decision."[5] O'Quinn v. Spiller, 806

---

[5] Petitioner separately takes issue with the First DCA's statement that "[h]is DNA was the only identifiable DNA on both the rope pieces and the knife sheath." King, 325

F.3d 974, 978 (7th Cir. 2015); see also Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011) (finding that AEDPA deference applied because petitioner could not "show that the decision—*i.e.*, the overall Strickland determination of the court—was based on—*i.e.*, rests upon—an unreasonable determination of the facts" (internal quotation marks omitted)).

Petitioner is not entitled to federal habeas relief.[6]

Accordingly, it is

**ORDERED**:

1.      The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any

---

So. 3d at 327. According to Petitioner, this statement is inaccurate because "the rope contain[ed]" Burney's DNA as well as his own. Doc. 1-1 at 12. True, the prosecution's DNA expert testified that Burney was a "possible contributor[]" to one section of the rope. Doc. 6-16 at 184. But even assuming this rendered the First DCA's statement inaccurate, Petitioner fails to show that this minor discrepancy had "any meaningful effect on [the court's] decision." O'Quinn, 806 F.3d at 978.

[6] Even if AEDPA deference did not apply, Petitioner would not be entitled to relief because his ineffective-assistance claim would fail under *de novo* review for the reasons set forth above. See Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1109-10 (11th Cir. 2012) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." (emphasis omitted)).

motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

3.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 4th day of February, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

TpaP-2
c:
Andrew King, #J51219
Counsel of Record

---

[7] The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.